## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

**EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION,**                      :
                                                 :      Case No. 4:23-cv-00694-RK
      Plaintiff,                    :
                                                 :
and                                              :
                                                 :
**BRYAN BANKS,**                                 :
                                                 :
      Intervenor Plaintiff,         :
                                                 :
v.                                               :
                                                 :
**SUN CHEMICAL CORPORATION,**                    :
                                                 :
      Defendant.                    :

## <u>DEFENDANT SUN CHEMICAL CORPORATION'S REPLY SUGGESTIONS<br>IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>

# I.    Defendant's Responses to Plaintiffs' Statement of Additional Material Facts ("SAMF").

## A. Introductory Facts

38. In the summer of 2019, Bryan Banks began working at Sun Chemical's Kansas City Facility, through a staffing company, as a temporary production technician; then, in September 2019, Sun Chemical asked Mr. Banks to continue in the same production technician position full-time, and his official direct-hire date was October 21, 2019. (Plaintiffs' Exhibit 1, Banks Dep., at 26:15-29:10.)

**Response**: Uncontroverted.

39. Sue Cornelsen was a manager at Sun Chemical's Kansas City Facility from at least 1994 until her retirement in August 2020; specifically, she was the Operations Manager from at least 1994 until approximately 2015, when she became the Plant Manager (also known as Site Manager), who oversees the lab, shipping, and production departments. (Plaintiffs' Exhibit 4, Cornelsen Dep., at 8:6-24, 11:9-15:25.)

**Response**: Uncontroverted.

## B. The October 24, 2019, Incident Between Nevarez and Banks

40. Early in the morning on October 24, 2019, before the start of his shift, Mr. Banks was in the lunchroom with three of his production coworkers, Larry Wilhite, Joe Stahl, and Joe Van Dolah, but production coworker Mr. Nevarez had not arrived yet. (Plaintiffs' Exhibit 1, Banks Dep., at 41:11-43:13 and 45:23-47:21; Plaintiffs' Exhibit 8, excerpts from deposition of Joseph Stahl ("Stahl Dep."), at 13:2-14:13; Plaintiffs' Exhibit 11, Investigation Notes, at pages 1-4.)

**Response**: Uncontroverted.

41. Mr. Stahl asked the others where Mr. Nevarez was, and Mr. Banks said he did not know. (*Id.*)

**Response**: Uncontroverted.

42. Mr. Nevarez was walking by the lunchroom, thought he heard Mr. Banks mention his name, and entered the lunchroom to confront Mr. Banks. (*Id.*)

**Objection**: Plaintiffs cannot testify as to what a third party, whom they have not deposed, "thought." Such an assertion is pure speculation unsupported by the record evidence.

**Response**: Controverted in part. It is uncontroverted that according to Mr. Warren's investigation notes, Mr. Nevarez told her that: "As I am walking by the lunchroom, I hear Bryan talking about me…." (Defendant's Exhibit 3, Document Number "DN" 52-3.) However, there is no evidence in the record as to what Mr. Nevarez "thought."

43. Mr. Nevarez "went straight up to [Mr. Banks] with his chest puffed out and his face red," said "Stop saying my F'g name, it is none of your F'g business you MF[,]" and said he would "mess [Mr. Banks] up." (*Id.*)

**Objection**: This assertion is an incomplete statement and an inaccurate summary of the witness accounts in this case.

**Response**: Controverted in part. It is uncontroverted that according to Mr. Warren's investigation notes, Mr. Van Dolah told her that Mr. Nevarez "went straight up to Bryan with his chest puffed out and his face red and said something like- Don't you be worrying about me you MF, I am sick and tired of you worry about where I am at." (Defendant's Exhibit 3, DN 52-3.) Separately, according to Mr. Warren's investigation notes, Joe Stahl (a temporary employee) told Ms. Waren that Mr. Nevarez "got up in Bryan's face and said, 'Stop saying my F'g name, it is none of your F'g business you MF'[.] At one point I think he said he would mess him up." (*Id.*) Larry Wilhite told Mr. Warren that Mr. Nevarez "came in and went up to Bryan and said you do not need to be worry about me." (*Id.*) Thus, it is controverted that any witness accounts stated that "Mr.

Nevarez 'went straight up to [Mr. Banks] with his chest puffed out and his face red,' said 'Stop saying my F'g name, it is none of your F'g business you MF[,]' and said he would 'mess [Mr. Banks] up' as selectively quoted by Plaintiffs.

44. After Mr. Nevarez confronted Mr. Banks in the lunchroom, Mr. Banks walked away from Mr. Nevarez and into the locker room to get changed for his shift. (*Id.*)

**Objection**: This assertion is an incomplete statement and an inaccurate summary of the witness accounts in this case.

**Response**: Controverted in part. While it is uncontroverted that Mr. Banks and Mr. Nevarez had a confrontation in the lunchroom, multiple witnesses indicated that Mr. Banks was also aggressive in his exchange with Mr. Nevarez. Including:

- Larry Wilhite stated that he heard Mr. Banks say "if you want to come at me, I can bring 30 guys to back me up." Further, Antonella Warren indicated in her notes at this point that "[H]e [Banks] was being aggressive as well."

- Joe Stahl stated that "They were both up in each other's face, nose to nose. Bryan said 'I ain't afraid of you.' They kept at it for a while…"

- Joe Van Dolah stated "There was more back and forth, but it was getting so intense that I walked out to go to the locker room." "They were both saying swear words to each other. A lot of FU's."

(Defendant's Exhibit 3, DN 52-3.)

45. Mr. Nevarez followed Mr. Banks into the locker room, continuing to call him a "stupid motherfucker" as he paced back and forth next to Mr. Banks. (*Id.*)

**Objection**: This assertion is an incomplete statement and an inaccurate summary of the witness accounts in this case.

**Response**: Controverted. None of the accounts indicate that Mr. Nevarez "followed" Mr. Banks into the locker room. (Defendant's Exhibit 3, DN 52-3.) One witness, Joe Stahl, stated that "and then Bryan and Ricardo walked out to go to the locker room." (*Id.*) Joe Van Dolah stated that "[t]hen Bryan walked in followed by Ricardo." (*Id.*) Mr. Van Dolah further stated that "Bryan was opening his locker to get something, and Ricardo said that he was sick of him in his business (as he was pacing back and forth) and then he slammed his palm into the locker next to Bryan's." (*Id.*) Mr. Nevarez also stated that Mr. Banks "walked away to go to the locker room and change and so did I. When I got in there, I was still upset, and we continued with some more words and cussing back and forth." (*Id.*)

46. As Mr. Banks bent over in front of his locker, Mr. Nevarez punched the locker next to Mr. Banks's head and called him a "fucking nigger." (*Id.*)

**Objection**: This assertion is an incomplete statement and an inaccurate summary of the witness accounts in this case.

**Response**: Controverted. None of the witnesses, including Mr. Banks, indicated that Mr. Nevarez punched the locker next to Mr. Banks' head and, in conjunction with hitting the locker, called Mr. Banks a "fucking nigger." (Defendant's Exhibit 3, DN 52-3.) The two actions were separate in time. (*Id.*) As indicated above in response to Plaintiffs' SAMF No. 45, Mr. Van Dolah stated that "Bryan was opening his locker to get something, and Ricardo said that he was sick of him in his business (as he was pacing back and forth) and then he slammed his palm into the locker next to Bryan's." (*Id.*)

47. Mr. Banks was shaken and walked away, heading out of the locker room. (*Id.*)

**Response**: Uncontroverted that one of the witnesses reported that Mr. Banks "looked shaken". (Defendant's Exhibit 3, DN 52-3.)

5

48. Mr. Nevarez followed Mr. Banks to the locker room door, screaming "fucking nigger" at him three more times. (*Id*.)

**Response**: Controverted. None of the witness accounts indicated Mr. Nevarez "followed" Mr. Banks into the locker room, screaming "fucking nigger." (Defendant's Exhibit 3, DN 52-3.) Only a single witness, Mr. Van Dolah, indicated that Mr. Nevarez used the term "fucking nigger" – but he only indicated it was used once. (*Id.*) Mr. Van Dolah did not use the term "screaming" nor did he indicate that Mr. Nevarez used the term "fucking nigger" while following Mr. Banks to the locker room door. Ms. Warren's notes of Mr. Van Dolah's interview are enclosed in Defendant's Exhibit 3, at DN 52-3.

49. Describing the lunchroom portion of the incident, Mr. Stahl said, "it was just really intense in there[,]" and Mr. Van Dolah said, "it was getting so intense that I walked out to go to the locker room." (Plaintiffs' Exhibit 11, Investigation Notes, at pages 2-3.)

**Objection**: This assertion is an incomplete statement, misleading, and an inaccurate summary of the witness accounts in this case.

**Response**: Controverted. Plaintiffs are using these statements out of context. Both Mr. Stahl and Mr. Van Dolah stated that the incident was "intense" due to both parties yelling at each other not because of Mr. Nevarez's actions alone. (Defendant's Exhibit 3, DN 52-3.)

50. Describing the locker room portion of the incident, Mr. Van Dolah said, "I have never witnessed something so intense." (Plaintiffs' Exhibit 11, Investigation Notes, at pages 3.)

**Objection:** This assertion is an incomplete statement and a misleading summary of the witness accounts in this case.

**Response**: Controverted in part. It is uncontroverted that Mr. Van Dolah stated to Ms. Warren that he has "never witnessed something so intense." (Defendant's Exhibit 3, DN 52-3.)

6

However, Mr. Van Dolah indicated that the intensity was related to both Mr. Banks' and Mr. Nevarez's conduct with respect to the October Incident, stating: "There was more back and forth but it was getting so intense that I walked out to go to the locker room" and that "it was intense." (*Id.*) "They were both saying swear words to each other. A lot of FU's." (*Id.*)

## C. Sun Chemical's Investigation of the October 2019 Incident

51. Later in the morning on October 24, 2019, Mr. Banks reported to Sue Cornelsen that Mr. Nevarez called him a "fucking nigger," punched a locker by his head, and made him feel threatened. Ms. Cornelsen made an excuse for Mr. Nevarez, saying he had a bad night, but told Mr. Banks she would look into it and talk to Mr. Nevarez. (Plaintiffs' Exhibit 1, Banks Dep., at 48:16-50:25; Plaintiffs' Exhibit 4, Cornelsen Dep., at 54:9-24.)

**Objection***: This assertion is an incomplete statement and a misleading summary of the testimony and evidence in this case.

**Response**: Controverted in part. While it is uncontroverted that Mr. Banks made a report to Sue Cornelsen on October 24, 2019, and that she looked into the report, Ms. Cornelsen denies that Mr. Banks told her that " Mr. Nevarez called him a "fucking nigger," punched a locker by his head, and made him feel threatened" and further denies making an excuse for Mr. Nevarez. (Exhibit A, Deposition excerpts of Susan Cornelsen ("Cornelsen Dep."), at 54-55, 57-58; Exhibit B, Declaration of Susan Cornelsen, "Cornelsen Declaration" at ¶¶ 10, 12, 13-15.) Ms. Cornelsen specifically testified that Mr. Banks never reported to her that the N-word was used, but "only said that he felt threatened" when he made the report to her, and that "he did not say anything about any—what words were used. He just said he felt threatened." (Cornelsen Dep. 54-55, 57-58.)

52. Later in the day on October 24, 2019, after speaking with Mr. Banks, Ms. Cornelsen went to the locker room and confirmed there was a dent in the locker; spoke with Mr. Nevarez,

who admitted he had slammed his fist against the locker next to Mr. Banks; and called Antonella Warren, a Sun Chemical HR Manager, to report the incident. (Plaintiffs' Exhibit 4, Cornelsen Dep., at 54:9-55:14.)

**Response**: Uncontroverted.

53. Ms. Warren started her investigation by interviewing via phone the five employees who had been present for the October 24, 2019, incident: Bryan Banks, Larry Wilhite, Joe Stahl, Joe Van Dolah, and Ricardo Nevarez. (Plaintiffs' Exhibit 11, Investigation Notes, at pages 1-4.)

**Response**: Uncontroverted.

54. All the witnesses present for October 24, 2019, incident, *including Mr. Nevarez,* told Ms. Warren that Mr. Nevarez started the heated exchange, not Mr. Banks. (Plaintiffs' Exhibit 11, Investigation Notes, at pages 1-4.)

**Objection:** This assertion is an incomplete statement and a misleading summary of the witness accounts in this case.

**Response**: Controverted. According to Mr. Warren's investigation notes, Mr. Nevarez explained to her that he "had been told by others that he [Mr. Banks] was always questioning where I was at or why I was doing something almost like he was insinuating that I was doing something wrong. So, when I heard him in the lunchroom, I walked up to him and said "I'm here, do you have a problem. Why are you always in my business?" I got more heated and I did swear but so did he." (Defendant's Exhibit 3, DN 52-3.) When Ms. Warren asked Mr. Nevarez for "other examples of Bryan being in his business" Mr. Nevarez said that "his son had committed suicide this year and he found out from Joe Van Dolah that he [Mr. Banks] had been questioning the validity of him [Mr. Nevarez] being off because he [Mr. Banks] couldn't find his son's obituary. Ric said that really hurt and angered him." (*Id.*) Mr. Van Dolah also told Ms. Warren that "[i]n

8

Ric's defense, Bryan has been in Ric's business, always asking what he is doing or where he is at." (*Id.*) Additionally, Mr. Wilhite told Ms. Warren that Mr. Banks "was being aggressive as well." (*Id.*) .

55. Mr. Banks reported to Ms. Warren a prior incident where Mr. Nevarez swore at him, and coworker Kristofer Savage told Mr. Nevarez to stop swearing; Mr. Banks also reported to Ms. Warren that another production coworker, Mike Smallwood, told him he had also been called a "Nigger" by Mr. Nevarez before. (Plaintiffs' Exhibit 11, Investigation Notes, at page 1.)

**Objection**: This assertion is an incomplete statement and a misleading summary of the witness accounts and testimony in this case.

**Response**: Controverted. Mr. Banks later clarified that Mr. Smallwood said that "someone" had called him "Nigger" but he did not tell Mr. Banks who. (Exhibit C, Deposition excerpts of Bryan Banks ("Banks Dep."), at 96:17-22.)

56. Mr. Stahl confirmed to Ms. Warren that, while they were in the lunchroom, Mr. Nevarez threatened to "mess [Mr. Banks] up" and was "definitely trying to be intimidating." (Plaintiffs' Exhibit 11, Investigation Notes, at page 2.)

**Objection**: This assertion is an incomplete statement and a misleading summary of the witness accounts in this case.

**Response**: Controverted in part. While Mr. Stahl did make the above statements to Ms. Warren during his interview, Mr. Stahl also indicated that "[t]hey were both up in each other's face nose to nose. Bryan said 'I ain't afraid of you.' They kept at it for a while and then Bryan and Ricardo walked out to the locker room…" (Defendant's Exhibit 3, DN 52-3.) In his deposition, Mr. Stahl confirmed that he did not hear Mr. Nevarez use the N-word and that Mr. Banks said to Mr. Nevarez "I'm not afraid of you. You know, get back or something to that effect" and that Mr.

9

Banks and Mr. Nevarez were "going toe to toe." (Exhibit D, Deposition excerpts of Joseph Stahl ("Stahl Dep."), at 14.)

57. The only witness to the locker room portion of the incident other than Mr. Banks and Mr. Nevarez was Mr. Van Dolah, and he confirmed to Ms. Warren that Mr. Nevarez called Mr. Banks a "F'g Nigger" and slammed his hand into the locker next to Mr. Banks. (Plaintiffs' Exhibit 1, Banks Dep., at 46:17-47:18; Plaintiffs' Exhibit 11, Investigation Notes, at pages 1-3.)

**Objection***:* This assertion is an incomplete statement and a misleading summary of the witness accounts in this case.

**Response**: Controverted*.* Mr. Van Dolah did not indicate that the two actions were simultaneous or immediately consecutive. (Defendant's Exhibit 3, DN 52-3.) The two actions were separate in time. (*Id.*) As indicated above in response to Plaintiffs' SAMF No. 45 and No. 46, none of the witnesses indicated that Mr. Nevarez punched the locker next to Mr. Banks' head and, in conjunction with hitting the locker, called Mr. Banks a "fucking nigger." (Defendant's Exhibit 3, DN 52-3.) Mr. Van Dolah stated that "Bryan was opening his locker to get something, and Ricardo said that he was sick of him in his business (as he was pacing back and forth) and then he slammed his palm into the locker next to Bryan's." (*Id.*)

58. Mr. Van Dolah also reported to Ms. Warren that he had heard Mr. Nevarez refer to Mr. Banks as a "F'g Nigger" before, and he noticed that Mr. Nevarez never spoke directly to Mr. Banks or looked him in the eye. (Plaintiffs' Exhibit 11, Investigation Notes, at page 3.)

**Objection***:* This assertion is an incomplete statement and a misleading summary of the witness accounts in this case. This assertion is also inadmissible, as it is based on hearsay. *Walker v. Wayne Cnty.*, *Iowa*, 850 F.2d 433, 434–35 (8th Cir. 1988)("[w]hen ruling on a summary judgment motion, the district court may consider only the portion of the submitted materials that

is admissible or useable at trial.")(citations omitted).

**Response**: Controverted in part. According to Ms. Warren's witness notes, Mr. Van Dolah, indicated that Mr. Nevarez "once said that he didn't like that 'F'g nigger' referring to Bryan," and later in the conversation, Mr. Van Dolah then separately indicated that some time ago when they were training, Mr. Van Dolah noticed Mr. Nevarez "never spoke directly to Bryan or looked him in the eye. (Defendant's Exhibit 3, DN 52-3.)

59. Mr. Van Dolah also reported to Ms. Warren that he knew Mr. Nevarez previously had a really bad confrontation with Mike Smallwood (who, like Mr. Banks, is African American), and Mr. Smallwood was vocal about Mr. Nevarez being prejudiced. (Plaintiffs' Exhibit 11, Investigation Notes, at page 3.)

**Objection**: This assertion is irrelevant, incomplete, misleading, immaterial, and inadmissible. The allegations are based on "hearsay." (Defendant's Exhibit 3, DN 52-3.); *Walker*, 850 F.2d at 434–35 ("[w]hen ruling on a summary judgment motion, the district court may consider only the portion of the submitted materials that is admissible or useable at trial.")(citations omitted).

**Response**: Controverted in part, irrelevant, inadmissible, and immaterial for purposes of Defendant's Motion for Summary Judgment. While it is uncontroverted that Ms. Warren's investigation notes state that Mr. Van Dolah reported to her that he knew Mr. Nevarez previously "had confrontations with Mike Smallwood and that one was really bad," Ms. Warren asked Mr. Van Dolah "how he knew" and he stated "hearsay and gossiping." (Defendant's Exhibit 3, DN 52-3.) It is also uncontroverted that *later* in the conversation Mr. Van Dolah told Ms. Warren that Mr. Smallwood "was vocal about Ricardo being prejudiced", but Mr. Van Dolah did not make that statement in relation to his report of the altercation between Mr. Smallwood and Mr. Nevarez. (*Id.*)

In fact, the alleged confrontation between Mr. Smallwood and Mr. Nevarez in 2017 had nothing to do with Mr. Banks, nor race and/or "prejudice". (Plaintiffs' Exhibit 7, DN 55-7; Cornelsen Dep. 108-110.) The Notice Ms. Cornelsen issued to Mr. Nevarez notes that it was Mr. Smallwood who "initiated an altercation" with Mr. Nevarez and that Mr. Smallwood wrote "a foul name on your [Mr. Nevarez's] calendar." (Plaintiffs' Exhibit 7, DN 55-7; Cornelsen Dep. 108:23-109:25.) Further, Ms. Cornelsen testified that she issued notices to both Mr. Smallwood and Mr. Nevarez for the altercation, and that the altercation involved Mr. Smallwood stating he had a gun. (Cornelsen Dep. 51-52, 108-110.) At no point did Ms. Cornelsen indicate that Mr. Nevarez was the aggressor or that he used any racial slurs. (*Id*. at 51-52, 107-111.) She determined that Mr. Smallwood was the "aggressor" and that Mr. Nevarez removed himself from the situation. (*Id*. at 111:9-20; Plaintiffs' Exhibit 7, DN 55-7.) Mr. Smallwood and Mr. Nevarez knew each other for over 20 years, and Mr. Nevarez was the best man at Mr. Smallwood's wedding. (Cornelsen Dep. at 52:2-5, 73:24-25.) There is simply no credible evidence that this alleged altercation had anything to do with race.

60. On October 30, 2019, Ms. Warren interviewed Kristofer Savage, a lab worker who was not present for the incident; Mr. Savage reported to Ms. Warren that he had heard Mr. Nevarez use the "N" word before but never directly at someone. (Plaintiffs' Exhibit 11, Investigation Notes, at page 5.)

**Response**: Uncontroverted.

61. On October 30, 2019, Ms. Warren interviewed Maurilio "Flacco" Calderon, a production coworker who was not present for the incident; Mr. Calderon reported to Ms. Warren that, during a prior incident between Mr. Nevarez and Mr. Smallwood, he heard Mr. Nevarez say "Nigger" to Mr. Smallwood. (Plaintiffs' Exhibit 11, Investigation Notes, at pages 4-5; Plaintiffs'

Exhibit 5, Warren Dep., at 19:3-23.)

**Objection**: This assertion is an incomplete statement and a misleading summary of the witness accounts in this case.

**Response**: Controverted. When Ms. Warren was interviewing him, Mr. Calderon stated that: "They were very heated, and both were spewing bad words at each other. I asked if he heard Ricardo say Nigger and he said he thought so, but Mike was also being very rude." (Defendant's Exhibit 3, DN 52-3.)

62. Ms. Warren did not talk with Mr. Smallwood, the only other African American besides Mr. Banks at the Kansas City Facility at the time, during her investigation of the October 24, 2019, incident. (Plaintiffs' Exhibit 5, Warren Dep., at 20:11-13.)

**Response**: Uncontroverted.

63. As a result of her investigation, Ms. Warren concluded that Mr. Nevarez initiated the interaction with Mr. Banks in the lunchroom, Mr. Banks walked away from Mr. Nevarez in the lunchroom into the locker room, Mr. Nevarez followed Mr. Banks from the lunchroom into the locker room, and Mr. Nevarez slammed the locker next to Mr. Banks and called him the "N word" while they were in the locker room. (Plaintiffs' Exhibit 5, Warren Dep., at 31:8-33:3.)

**Objection**: This assertion is an incomplete statement and a misleading summary of the testimony in this case.

**Response**: Controverted in part. While it is uncontroverted that Ms. Warren concluded that Mr. Nevarez slammed the locker next to Mr. Banks and may have called Mr. Banks the "N" word (although not at the same time), based on Mr. Van Dolah's witness account (Exhibit E, Deposition excerpts of Antonella Warren ("Warren Dep."), at 32:14-33:3), Ms. Warren also specifically testified:

13

**Q**.     After speaking with the variety of witnesses, did you come to the conclusion that Mr. Banks had removed himself from the break room to go into the locker room?

**A**.     Not exactly. He first interacted with Mr. Nevarez and in his words stood up to him, was yelling at him, swearing at him as well, threatening him as well, and then he walked away.

(Warren Dep. 31:13-22.)

### D. Sun Chemical's Prior Knowledge of Hostile Work Environment Created by Nevarez

64. Until Sun Chemical hired Mr. Banks in 2019, Mike Smallwood had been the only African American employee at the Kansas City Facility for approximately thirty years. (Plaintiffs' Exhibit 3, Smallwood Dep., at 33:15-34:5.)

**Objection**: This assertion is an incomplete statement and a misleading summary of the testimony in this case.

**Response**: Controverted and incomplete. Mr. Smallwood testified that he was the only African American employee at the Kansas City Facility other than temporary employees. (Exhibit F, Deposition excerpts of Mike Smallwood ("Smallwood Dep."), at. 34:1-5.)

65. During his employment with Sun Chemical before Mr. Banks was hired, Mr. Smallwood heard Mr. Nevarez calling him names, mostly in Spanish, and one of their coworkers, Mr. Calderon, told Mr. Smallwood that Mr. Nevarez was calling him the "N" word. (Plaintiffs' Exhibit 3, Smallwood Dep., at 17:11-18:18 and 32:20-34:24.)

**Objection**: This assertion is an incomplete statement and a misleading summary of the testimony in this case. This assertion is also inadmissible, as it is based on hearsay. *Walker*, 850 F.2d at 434–35 ("[w]hen ruling on a summary judgment motion, the district court may consider only the portion of the submitted materials that is admissible or useable at trial.")(citations omitted).

**Response**: Controverted. Mr. Calderon testified he has been the only Spanish speaker at

14

the plant and that Mr. Nevarez did not speak Spanish. He further testified that he never heard Mr. Nevarez curse or call Mr. Banks names in Spanish. (Exhibit G, Deposition excerpts of Maurilio Calderon ("Calderon Dep."), at 33:1-5; 33:25-34:1-5; 38:7-9.) Mr. Calderon worked with Mr. Nevarez for more than 20 years. (*Id.* at 14:2-14:25.)

66. Mr. Smallwood complained many times to Ms. Cornelsen, prior to Mr. Banks being hired, that Mr. Nevarez had been calling him the "N" word, and it was creating a hostile work environment. (Plaintiffs' Exhibit 3, Smallwood Dep., at 17:11-18:18, 22:2-23:8, 32:20-34:24, 46:1-18, and 55:21-58:7.)

**Response**: Controverted. Mr. Smallwood did not testify that he "complained many times to Ms. Cornelsen, prior to Mr. Banks being hired, that Mr. Nevarez had been calling him the "N" word." (Smallwood Dep. 17-18.) Further, Ms. Cornelsen denies that Mr. Smallwood ever complained to her about Mr. Nevarez calling him the "N" word. (Cornelsen Dep. 53-54; Cornelsen Declaration at ¶¶ 9-11.)

67. On approximately May 24, 2017, there was an incident at the Kansas City Facility involving an argument between Mr. Smallwood and Mr. Nevarez. Ms. Cornelsen heard the argument in the plant from her office and went to address it. She physically got between them, settled them down, and counseled each of them on yelling and screaming and threatening. (Plaintiffs' Exhibit 4, Cornelsen Dep., at 51:17-52:22; Plaintiffs' Exhibit 7, Acknowledgement to Ricardo Nevarez ("Nevarez Acknowledgement"), at page 1.)

**Objection**: These allegations are irrelevant, misleading, and immaterial.

**Response**: Uncontroverted but irrelevant and immaterial for purposes of Defendant's Motion for Summary Judgment. While it is uncontroverted that there was an altercation between Mr. Smallwood and Mr. Nevarez on May 24, 2017, that alleged confrontation has nothing to do

with this case or Mr. Banks, nor race and/or prejudice. (Plaintiffs' Exhibit 7, DN 55-7; Cornelsen Dep. 108-110.) The Notice Ms. Cornelsen issued to Mr. Nevarez notes that it was Mr. Smallwood who "initiated an altercation" with Mr. Nevarez and that Mr. Smallwood wrote "a foul name on your [Mr. Nevarez's] calendar." (Plaintiffs' Exhibit 7, DN 55-7; Cornelsen Dep. 108:23-109:25.) Further, Ms. Cornelsen testified that the altercation involved Mr. Smallwood stating he had a gun. (Cornelsen Dep. 51-52, 108-110.) At no point did Ms. Cornelsen indicate that Mr. Nevarez used any racial slurs. (*Id.* at 51-52, 107-111.) Mr. Smallwood and Mr. Nevarez knew each other for over 20 years, and Mr. Nevarez was the best man at Mr. Smallwood's wedding. (*Id.* at 52:2-5, 73:24-25.) There is simply no credible evidence that this alleged altercation had anything to do with race.

68. As a result of the May 24, 2017, incident between Mr. Nevarez and Mr. Smallwood, Ms. Cornelsen gave Mr. Nevarez an "Acknowledgement" on May 26, 2017, telling him: "You responded correctly and removed yourself from the area to insure [sic] the altercation did not escalate. . . . You responded to the altercation correctly and were not the aggressor." Ms. Cornelsen did not give Mr. Smallwood a similar "Acknowledgement." (Plaintiffs' Exhibit 7, Nevarez Acknowledgement, at page 1; Plaintiffs' Exhibit 3, Smallwood Dep., at 18:19-19:16 and 53:1-55:20.)

**Objection***: This assertion is an incomplete statement and a misleading summary of the testimony in this case. These allegations are also irrelevant and immaterial.

**Response**: Controverted in part. While it is uncontroverted that Ms. Cornelsen gave Mr. Nevarez the subject "Acknowledgement," Ms. Cornelsen *did* give Mr. Smallwood a similar "Acknowledgment". In fact, Ms. Cornelsen testified she gave Mr. Smallwood an almost identical "Acknowledgment" that was "word for word" to that of Mr. Nevarez. (Cornelsen Dep. 108:7-9.) As described above with respect to Plaintiffs' SAMF No. 67, these allegations relating to the May

24, 2017 incident between Mr. Nevarez and Mr. Smallwood are irrelevant and immaterial for purposes of Defendant's Motion for Summary Judgment.

**E. Discipline and Non-Discipline Issued to Banks by Sun Chemical in November 2019**

69. On November 6, 2019, after Mr. Banks "left a message on the general voicemail stating that [he] would not be in that day[,]" Ms. Cornelsen gave Mr. Banks a letter reminding him that "[w]e have requested that these call-ins be made to your supervisor." (Plaintiffs' Exhibit 13, letter regarding call-in procedures to Bryan Banks ("Banks Call-In Letter"), at page 1; Plaintiffs' Exhibit 4, Cornelsen Dep., at 81:14-83:5.)

**Response**: Uncontroverted.

70. The November 6, 2019, letter regarding call-in procedures given to Mr. Banks was intended as "information" or a "heads-up" rather than discipline, and it did not include the word "discipline." (Plaintiffs' Exhibit 13, Banks Call-In Letter, at page 1; Plaintiffs' Exhibit 4, Cornelsen Dep., at 84:4-18 and 88:10-22.)

**Response**: Uncontroverted.

71. On November 7, 2019, Sun Chemical issued Mr. Banks a Written Warning Notice for "Inappropriate behavior" with the following "Summary of Incident":

> On 10/24/2019, you reported an incident that you felt another employee, Ricardo Nevarez, was verbally and physically harassing you. Sun Chemical does not condone this type of behavior and, after investigating, has taken appropriate action.
>
> Our investigation also revealed that you used profanity against Ricardo. In the future you need to refrain from doing that. If an incident happens again, you should walk away and alert a supervisor.
>
> Verbal Profanity is considered inappropriate behavior that will not be tolerated. Should a similar occurrence happen, you will be subject to disciplinary action.

The Written Warning Notice identified the "Discipline" imposed as "Warning only" and was signed by Ms. Cornelsen. (Plaintiffs' Exhibit 6, Banks Written Warning Notice, at page 1.)

17

**Objection**: This assertion is an incomplete statement and a misleading summary of the evidence in this case.

**Response**: Controverted in part . While it is uncontroverted that Ms. Cornelsen signed the document, it was drafted and sent to her for delivery to Mr. Banks by Antonella Warren. (Cornelsen Dep. 70:7-25.) Additionally, the fact that the word "discipline" appears on the form Warning, does not indicate that the action itself was disciplinary in nature. The document speaks for itself, and indicates that it is a "Warning only" with no tangible consequences. (Defendant's Exhibit 6, DN 52-6.)

72. The November 7, 2019, Written Warning Notice issued to Mr. Banks was discipline, a first warning to highlight the infringement, which is part of the disciplinary process at Sun Chemical. (Plaintiffs' Exhibit 4, Cornelsen Dep., 78:15-79:6 and 88:23-89:1.)

**Response**: Controverted. Ms. Warren, who made the decision to issue the Notice to Mr. Banks, did not describe the Notice as "discipline." She stated "verbal warnings typically are not considered full disciplinary action. They're intended to be coaching before you start getting to the more formal disciplinary steps. So that's what it was intended to be." In response to the EEOC's follow up question"[I]s it not considered by you be part of the disciplinary process?", Ms. Warren stated: "Not in this particular case. It was really intended to be just a verbal warning to him on [his] fighting back behavior." (Warren Dep. 29:17-30; 30:14-20.)

73. It is not unusual for profanity to be used by employees and supervisors at Sun Chemical's Kansas City Facility, and no employee other than Mr. Banks has ever been written up for using profanity there. (Plaintiffs' Exhibit 9, excerpts from deposition of Larry Wilhite ("Wilhite Dep."), at 11:15-22; Plaintiffs' Exhibit 8, Stahl Dep., at 15:2-10 and 18:11-15; Plaintiffs' Exhibit 1, Banks Dep., at 59:1-17, 60:13-62:2, and 94:12-95:7; Plaintiffs' Exhibit 10, excerpts from

deposition of Kristofer Savage ("Savage Dep."), at 16:4-18:24.)

**Objection**: This assertion is an incomplete statement and a misleading summary of the testimony in this case.

**Response**: Controverted. None of the cited witnesses testified that any supervisor was aware of profanity use in the workplace. Mr. Wilhite testified that had Sue Cornelsen heard profanity, she would have addressed it. (Exhibit H, Deposition excerpts of Laurence Wilhite, ("Wilhite Dep."), at 23:19-25; 24:1-9.) Mr. Savage had no knowledge of Sue Cornelsen having heard profanity in the workplace. (Exhibit I, Deposition excerpts of Kristopher Savage, ("Savage Dep."), at 16:23-25; 17:1-3.) In fact, Sue Cornelsen denies that she had witnessed it "regularly" and failed to address it. (Cornelsen Declaration at ¶¶ 4-6.) Moreover, contrary to the EEOC's statement, Mr. Stahl testified that the use of profanity *was* unusual: "Oh, not real common. Not real common." (Stahl Dep. 15:11-13; 16-2-5.) He further testified it was never in the hearing of supervisors. (*Id.*) Finally, Mr. Calderon denied it was common, testifying that he "never heard anybody" use profanity in the workplace. (Calderon Dep. 38:18-25; 39:1-7.)

74. Mr. Banks felt his dignity was taken when he was written up for using profanity while other employees, who have not complained to HR about racial harassment, use profanity in the workplace and are not written up. (Plaintiffs' Exhibit 1, Banks Dep., at 59:1-60:12.)

**Response**: Controverted. Plaintiffs produced no evidence that supervisors at the facility heard profanity and failed to address it. *See* Objection and Response to Plaintiffs' SAMF No. 73 above.

75. After Mr. Banks complained to HR about racial harassment, Ms. Cornelsen refused to communicate work directives to Mr. Banks directly, as she had previously done, and instead told other people to tell Mr. Banks what to do. (Plaintiffs' Exhibit 1, Banks Dep., at 73:25-74:12 and

76:5-17.)

**Response**: Controverted. Ms. Cornelsen denies that she refused to communicate work directives to Mr. Banks after he complained to HR. (Cornelsen Declaration at ¶¶ 16-17.)

76. After Mr. Banks was written up for "us[ing] profanity against [Mr. Nevarez]," he continued to have complaints relating to Mr. Nevarez, including that Mr. Nevarez told a vendor that Mr. Banks was trying to get Mr. Nevarez fired, and that Mr. Nevarez referred to Mr. Banks as "negro," which is Spanish for "black." (Plaintiffs' Exhibit 1, Banks Dep., at 54:2-55:25.)

**Objection**: This assertion is misleading and inadmissible. The allegations are based on hearsay. *Walker*, 850 F.2d at 434–35 ("[w]hen ruling on a summary judgment motion, the district court may consider only the portion of the submitted materials that is admissible or useable at trial.")(citations omitted).

**Response**: Controverted. Mr. Banks' statement that Mr. Nevarez allegedly told a vendor that Mr. Banks was trying to get Mr. Nevarez fired is hearsay. In fact, Mr. Banks admitted he did not even remember who told him the statement had been made. Furthermore, with respect to the statement that Mr. Nevarez referred to Mr. Banks as "negro" Banks stated in his deposition "I can't say he was talking about me" in reference to the use of the word "negro."  Mr. Banks further admitted that Mr. Nevarez never directly referred to him as "nigger" in English after Mr. Nevarez was disciplined for it. (Banks Dep. 54:2-25, 55:1-2, 55:12-22, 56:1-2.) Additionally, Mr. Calderon testified he has been the only Spanish speaker at the plant and that Mr. Nevarez did not speak Spanish. He further testified that he never heard Mr. Nevarez curse or call Mr. Banks names in Spanish. (Calderon Dep. 33:1-5; 33:25-34:1-5; 38:7-9.) Mr. Calderon works with Mr. Banks almost every day in the same part of the facility, and also worked with Mr. Nevarez for more than 20 years. (*Id.* at 14:2-14:25.)

## I. Legal Argument in Further Support of Motion for Summary Judgment.

Mr. Banks, a current employee, complained of only one incident of alleged racial harassment on October 24, 2019 (the "October Incident"). (Plaintiffs Suggestions in Opposition to Motion for Summary Judgement, "DN 55", at pp. 12-13, 33.) Sun Chemical investigated the October Incident and disciplined the alleged harasser. (*Id.* at pp. 13, 15, 29, 33.) Mr. Banks made no other complaints to Sun Chemical relating to discrimination or harassment. (Banks Dep. 56, 62, 64-65, 95; DN 55 at p. 25; Defendant's Exhibit 7, DN 52-7.) His pay, duties, and schedule have not been negatively impacted. (Banks Dep. 34, 37, 59-60.) These decisive facts are not in dispute.

Plaintiffs failed to address Sun Chemical's arguments regarding their Title VII race discrimination claim on pages 7-11 of Defendant's Suggestions. Thus, any objections to the Company's position on that claim are waived. *Collins v. Union Pac. R.R. Co.*, 108 F.4th 1049 (8th Cir. 2024) ("Failure to oppose a basis for summary judgment constitutes waiver of that argument.") Plaintiffs' remaining claims of racial harassment and retaliation under Title VII fail as a matter of law because the warning Mr. Banks received is not an adverse action, Mr. Banks was not subject to severe or pervasive conduct, and the Company took appropriate remedial action with respect to the only instance of alleged racial harassment of which it was notified and/or had any knowledge. Additionally, Plaintiffs are unable to present any evidence of pretext and/or discriminatory animus.

### A. Plaintiffs' Retaliation Claim Fails Because the Warning Mr. Banks Received on November 7, 2019, Was Not An Adverse Action As a Matter of Law.

Whether the November 2019 Warning Mr. Banks received is an adverse action is a question of law for the Court to decide. *See Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1079 (8th Cir. 2006); *Warren v. Nucor Corp.*, No. 3:22-CV-00130-BSM, 2023 WL 8894332, at *6 (E.D. Ark. Dec. 26, 2023). It is not a fact in dispute as asserted by Plaintiffs (DN 55 at p. 9.), but rather it is "[t]he critical element in a retaliation claim." *Fuller v. Fiber Glass Sys., LP,* No. 4:07CV01120-

WRW, 2009 WL 737322, at *5 (E.D. Ark. Mar. 20, 2009) (*citing Moisant v. Air Midwest, Inc.,* 291 F.3d 1028, 1031 (8th Cir.2002)."An adverse employment action is so critical in proving a retaliation claim that summary judgment is appropriate if the plaintiff fails to provide sufficient facts demonstrating that []he suffered an adverse employment action." *Anthony v. Potter,* No. 2:09-CV-00132-BRW, 2011 WL 4402764, at *5 (E.D. Ark. Sept. 22, 2011)(citation omitted).[1]

"An adverse employment action is a 'tangible change in duties or working conditions that constitute a *material employment disadvantage.*'" *Fuller*, 2009 WL 737322, at *5 (*quoting Burchett v. Target Corp.,* 340 F.3d 510, 518 (8th Cir.2003) (emphasis in quote)). "Not every setback amounts to an adverse employment action." *Anthony*, 2011 WL 4402764, at *3 (*quoting Powell*, 445 F.3d 1074). Simply put, "[n]ot everything that makes an employee unhappy is an actionable adverse decision." *Altonen v. City of Minneapolis*, 487 F.3d 554, 560 (8th Cir. 2007)(*quoting Bechtel v. City of Belton,* 250 F.3d 1157, 1162 (8th Cir.2001)) (citation omitted).

*Muldrow v. City of St. Louis, Missouri*, 144 S. Ct. 967 (2024) did not change this well settled law with respect to Title VII retaliation claims. *Muldrow* <u>clarified</u> "the requirements of a Title VII discrimination claim[.]" *Collins,* 108 F.4th at 1053. Plaintiffs alleging retaliation must still prove that "the employer took 'materially adverse' actions that could dissuade a reasonable worker from making a charge of discrimination in support of her retaliation claim." *Russell v. DeJoy,* No. 23-2968, 2024 WL 3062238, at *1 (8th Cir. June 20, 2024)(*quoting Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006)). *White* remains good law. The Supreme Court specifically noted that "*White* adopted the standard for reasons peculiar to the retaliation context" and a retaliatory action must be "'materially adverse,' meaning that it causes 'significant' harm.'"

---

[1] The "meaning" of the Warning Mr. Banks received is not genuinely in dispute as asserted by Plaintiffs. (DN 55 at pp. 9, 19-20, 50.) Antonella Warren was the decision maker with respect to the Warning. (Warren Dep. 27-30.) She did not believe the Warning was "discipline" as it was just a "coaching." (*Id.*) The unrelated November 6, 2019, letter Mr. Banks received is irrelevant, as it was just information about call-in procedures from Sue Cornelsen, who made the decision to issue that letter, and it was unrelated to the October Incident. (DN 55 at p. 50; Cornelsen Dep. 82-84.)

*Muldrow*, 144 S. Ct. at 976 (citation omitted). "If an action causes less serious harm, … it falls outside the purposes of the ban on retaliation." *Id*. Here, Plaintiffs cannot show that the alleged "retaliation . . . produced some injury or harm," because Mr. Banks admitted that his pay, duties, and schedule were unaffected by the Warning. *Gilmore-Lee v. Vilsack,* No. 4:20-CV-00408-DGK, 2022 WL 16838902, at *10 (W.D. Mo. Nov. 9, 2022);(Banks Dep. 34, 37, 59-60.)

Plaintiffs claim that Mr. Banks' "dignity was taken[.]" (DN 55 at pp. 40, 49; Banks Dep. 60.) They point to no other alleged harm or injury and thus their claim fails. *Martinez-Medina v. Vilsack*, No. 22-00021-CV-W-GAF, 2024 WL 3158375, at *7 (W.D. Mo. Apr. 23, 2024) (Title VII requires "some disadvantageous change in an employment term or condition") (citations omitted). *Hill v. McDonough*, No. 4:21-CV-00466-RK, 2023 WL 2061246, at *10-11 (W.D. Mo. Feb. 16, 2023) further compels dismissal of Plaintiffs' claims, as an action cannot constitute retaliation when it has not "harmed or injured aspects of [] employment such as pay, responsibilities, training opportunities, or any other terms or conditions of his employment." *Id.*[2]

Plaintiffs provide no legal basis for claiming Mr. Banks' warning is an adverse employment action, however captioned. Even if, for argument's sake, the Warning was disciplinary in nature, it is not an adverse action as a matter of law because it had no effect on Mr. Banks' employment and he suffered no tangible harm as a result. *Fuller*, 2009 WL 737322, at *5 ("a disciplinary warning is not an adverse employment action") (citation omitted); *Powell*, 445 F.3d 1074 (no adverse action found where management gave plaintiff three written reprimands, because plaintiff could not show a reduction in pay or hours, or any other significant change to the conditions of employment); *Warren,* 2023 WL 8894332, at *6 (two disciplinary warnings "were not materially

---

[2] Plaintiffs' vague allegation that Ms. Cornelsen stopped communicating with Mr. Banks directly (DN 55 at p. 41), which is disputed, is also insufficient as a matter of law. *Clegg v. Arkansas Dept. of Correction*, 496 F.3d 922, 926 (8th Cir. 2007)("[m]inor changes in … working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action").

23

adverse employment actions because while they could have led to [employee's] termination had he continued to violate [] policies, they did not themselves reduce his compensation or otherwise tangibly affect his employment.") (citation omitted); *Hill v. City of Pine Bluff, Ark.,* 696 F.3d 709, 715 (8th Cir. 2012) (dismissing retaliation claim due to "no loss of pay, reduction in hours or responsibilities, or exclusion from training"). Plaintiffs' retaliation claim fails because Mr. Banks suffered no "harm respecting an identifiable term or condition of employment." *Cole v. Grp. Health Plan, Inc*., 105 F.4th 1110, 1114 (8th Cir. 2024)(*citing Muldrow*, 144 S. Ct. at 974.); *Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 644 (8th Cir. 2009).[3]

**B. Plaintiffs' Hostile Work Environment Claim Fails Because Mr. Banks Was Not Subject to Severe or Pervasive Conduct and the Company Took Appropriate Action.**

"A claim of hostile work environment based on co-worker harassment requires proof that [Plaintiff] was the target of severe or pervasive harassment on account of his race; that the harassment affected a term, condition, or privilege of his employment; and that [the employer] knew or should have known of the racial harassment and failed to take adequate remedial measures." *Woodland v. Joseph T. Ryerson & Son, Inc.,* 302 F.3d 839, 843 (8th Cir. 2002). Plaintiffs have failed to establish each of these critical elements of their hostile work environment claim.

**1. The alleged October Incident was not severe or pervasive.**

It is no coincidence that Plaintiffs fail to cite any precedent within the Eighth Circuit for their proposition that the single incident involving the "N" word in October 2019 is sufficiently severe or pervasive to sustain a claim of a hostile work environment. It is not, and Plaintiffs' allegations are insufficient as a matter of law. *Woodland,* 302 F.3d at 843 (finding that sporadic racially-motivated conduct by coworkers, including three occasions of racial epithet used against

---

[3] Plaintiffs' argument that the Warning was materially adverse, is also undermined by the fact that Mr. Banks received the Warning on November 7, 2019 (Defendant's Exhibit 6, DN 52-6), and then filed an EEOC Charge on May 10, 2020. (DN 52-9.) In *City of Pine Bluff, Ark.*, 696 F.3d at 715, a written warning to an employee was deemed not materially adverse because it would not "have dissuaded a reasonable worker from continuing in her protected activity" and had no "chilling effect" when the employee engaged in protected activity after receiving the warning.

24

plaintiff, two occasions against other employees, and racist graffiti were "neither severe nor pervasive enough to create a hostile work environment."); *see Hill*, 2023 WL 2061246, at *8. This Circuit "imposes 'a high threshold,' [] that requires Plaintiff to show that "the harassment []he experienced was sufficiently severe or pervasive to alter the conditions of [] employment and create an abusive working environment[.]" *Gilmore-Lee*, 2022 WL 16838902, at *9. "A hostile work environment is a cumulative phenomenon, composed of 'a series of separate acts[.]'" *Gill v. McDonough,* No. 21-00411-CV-W-LMC, 2023 WL 8037916, at *14 (W.D. Mo. Nov. 20, 2023) (citations omitted); *Shajaat v. McDonough,* No. 4:22CV00490 JM, 2024 WL 1963262, at *4 (E.D. Ark. May 3, 2024) ("the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment.") (citation omitted).  As recently stated by this Court:

> A plaintiff asserting a race-based hostile work environment claim must show a workplace "permeated with discriminatory intimidation, ridicule, and insult." *Id.* (citation and quotation marks omitted). In other words, "a few isolated incidents of racially-oriented [*sic*] harassment or hostility is insufficient to establish a violation"; rather, the employee "must convince the trial court that he or she has endured a steady barrage of opprobrious racial comment."

*Hill*, 2023 WL 2061246, at *8 (citation omitted). Here, Mr. Banks never heard Mr. Nevarez use the "N" word outside of its alleged use during the October 2019 incident. (Banks Dep. 56, 62, 95.)

Plaintiffs mischaracterize the single interaction between Mr. Nevarez and Mr. Banks which is the subject of this lawsuit, by claiming that the October Incident was a "racist assault." (DN 55 at p. 53.) Mr. Stahl, one of the coworkers whom the EEOC highlights as having witnessed and described the October Incident as "intense" testified that he did not even hear Mr. Nevarez use the "N" word. (Stahl Dep. 14-15; Defendant's Exhibit 3, DN 52-3.) Mr. Stahl further confirms that Mr. Banks and Mr. Nevarez were "going toe to toe" which is where the "intensity" of the interaction came from. (*Id.*) Plaintiffs also highlight witness interview notes from Joe Van Dolah (who was not deposed), who stated that "it was getting so intense" because of the "back and forth".

25

(Defendant's Exhibit 3, DN 52-3). Mr. Van Dolah explained that Mr. Banks and Mr. Nevarez had a history of not getting along because "Bryan has been in Ric's business, always asking what he is doing or where he is at" and there was an instance of Mr. Banks questioning Mr. Nevarez while Mr. Nevarez was training him. (*Id.*) Mr. Nevarez confirmed that "[t]hings with Bryan have been building since he was a temp back in late June/July" when he was training Mr. Banks and an incident occurred in the lab. (*Id.*) Specifically, Mr. Nevarez stated that Mr. Banks asked him

> "What are you doing in here?" with a tone like I should not be in there. I was his trainer; he had been there under a week and I thought what the heck? I just felt it was very disrespectful and he had no business insinuating I was just sitting around.

(*Id.*) Mr. Nevarez also stated to Ms. Warren that Mr. Banks had questioned the validity of Mr. Nevarez having time off work after Mr. Nevarez's son committed suicide, something that was utterly inappropriate for Mr. Banks to question. (*Id.*)

On the day of the October Incident, Mr. Nevarez overheard Mr. Banks talking about him, which Mr. Nevarez described as follows:

> … I guess I had just had it and I blew up a bit. I had been told by others that he was always questioning where I was at or why I was doing something almost like he was insinuating that I was doing something wrong. So, when I heard him in the lunchroom, I walked up to him and said "I'm here, do you have a problem. Why are you always in my business?" I got more heated and I did swear but so did he.

(*Id.*) This was not a "racist assault." This was a conflict between two people in which at one point one of them allegedly used a racial epithet. The law is clear that "racial slurs alone do not render a work environment hostile as a matter of law." *Singletary v. Missouri Dep't of Corr.*, 423 F.3d 886, 893 (8th Cir. 2005)(citation omitted). "[S]ome conduct well beyond the bounds of respectful and appropriate behavior is nonetheless insufficient to be severe and pervasive." *Henson v. Union Pac. R.R. Co.*, 3 F.4th 1075, 1083 (8th Cir. 2021) (internal quotation marks omitted). While the alleged October 2019 incident may have been "unprofessional, inappropriate, and aggressive, []

the facts alleged fail to suggest the kind of severe and pervasive conduct required to support a hostile environment claim." *Snowden v. Oriental Trading Co., Inc*., No. 8:22CV435, 2024 WL 1156427, at *4 (D. Neb. Mar. 15, 2024) (finding plaintiff did not allege a racially hostile work environment when she claimed a physical assault after being warned to "watch" her employer and told that the employer belonged to racist motorcycle club) (*citing Bainbridge v. Loffredo Gardens, Inc*., 378 F.3d 756, 759 (8th Cir. 2004) (racial remarks made directly to plaintiff once a month for two years by owner and operators insufficient to render workplace objectively hostile); *Woodland,* 302 F.3d at 844*; Singletary,* 423 F.3d at 893 ("Under our case law, the racial slurs did not render the work environment . . . objectively hostile . . . . [W]e held six instances of racially derogatory language from managers and coworkers over the course of a year and a half, together with burning cross graffiti, did not render the workplace objectively hostile.") (citation omitted).[4]

### 2. The alleged conduct did not affect any term or condition of Banks' employment.

A hostile work environment exists only where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Davis v. McDonough,* No. 21-00860-CV-W-BP, 2023 WL 7298591, at *6 (W.D. Mo. Nov. 1, 2023*)* (citation omitted); *Tealeh v. DeJoy,* No. 21-CV-1318 (JNE/DJF), 2024 WL 1856600, at *9–10 (D. Minn. Apr. 29, 2024) (holding that "[t]he race-based comments and incidents of harassment identified by Tealeh, while offensive, are not sufficiently severe or pervasive to alter the terms and conditions of his employment, as required by Eighth Circuit precedent.") (citations omitted); *see also Watson*

---

[4] *See also Watson v. Heartland Health Lab'ys, Inc.,* 790 F.3d 856, 863 (8th Cir. 2015) (a "single racial insult" is insufficient to sustain a claim); *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 566-67 (8th Cir. 2000) (finding no hostile work environment when plaintiff had property damaged, was shoved against a wall, and threatened with bodily harm); *Porter v. City of Little Rock, Ark.,* 941 F. Supp. 804, 807 (E.D. Ark. 1995) (summary judgment warranted when only one directed "act of racial harassment" alleged); *Green v. Walmart Store E. L.P*., No. 4:24-CV-00107 JAR, 2024 WL 1111693, at *4 (E.D. Mo. Mar. 13, 2024)("By their nature, hostile work environment claims are not isolated incidents, but rather entail ongoing and repeated conduct."); *Nitsche v. CEO of Osage Valley Elec. Coop.,* 446 F.3d 841, 846 (8th Cir. 2006); *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 935 (8th Cir. 2002).

*v. McDonough*, 996 F.3d 850, 856 (8th Cir. 2021); *Parker v. United States*, No. 4:19-CV-00939-FJG, 2023 WL 9228181, at *10-11 (W.D. Mo. Aug. 29, 2023).

Here, Plaintiffs' allegations are insufficient as a matter of law because Mr. Banks' employment has not been affected in any way. Plaintiffs vaguely claim that the alleged "harassment impacted not just Mr. Banks, but also his coworkers who witnessed it" but include no specifics. (DN 55 at p. 46.) Mr. Banks admitted that his pay, duties, and schedule have not been negatively impacted in any way and at most he alleges that his "dignity was taken". (Banks Dep. 34, 37, 59-60; DN 55 at p. 49.) Thus, summary judgment is warranted as a matter of law because the terms or conditions of Mr. Banks' employment have not been affected. *McDonough*, 996 F.3d at 856.

### 3. Sun Chemical took appropriate remedial action after the October Incident and had no knowledge of any prior racial harassment.

Plaintiffs cannot present any evidence that Sun Chemical "knew or should have known about the harassment and failed to respond in a prompt and effective manner." *Anderson v. Durham D & M, L.L.C.,* 606 F.3d 513, 519 (8th Cir. 2010)(citation and quotation omitted). The Company's response was both prompt and appropriately remedial in nature; Mr. Nevarez was suspended for five (5) days and issued a final written warning. (Defendant's Exhibit 5, DN 52-5.) Mr. Banks made no other complaints about Mr. Nevarez following his suspension. (Banks Dep. 56, 64-65; Defendant's Exhibit 7, DN 52-7.)[5] Even if Plaintiffs are "dissatisfied with management's response, Title VII does not require an employer to take specific disciplinary action against an alleged harasser; rather, the employer must take prompt remedial action reasonably calculated to end the harassment." *Tealeh*, 2024 WL 1856600, at *9-10 (citation omitted). Plaintiffs' disagreement with the Company's decision in disciplining Mr. Nevarez is not enough to create a triable issue of fact.

---

[5] Plaintiffs claim the Affidavit of the current Plant Manager is immaterial because Mr. Jones was hired in August 2020 and has no knowledge of the October 2019 incident (DN 55 at p. 24.), even though Plaintiffs are now asserting that Mr. Nevarez continued to make comments *after* the October incident. The Affidavit is also material to the Company's defense and undermines Plaintiffs' claims because it establishes that Mr. Banks made no other complaints.

Plaintiffs now allege that Mr. Banks had other complaints about Mr. Nevarez but did not raise them. (DN 55 at pp. 23, 33.) These allegations are woefully insufficient to overcome summary judgment. *Martin v. Champion Ford, Inc.,* 41 F. Supp. 3d 747 (N.D. Iowa 2014)(employer either did not know of alleged race harassment by co-workers and/or took proper action regarding harassment, and thus could not be liable for alleged harassment under Title VII). These new allegations in the Response, that Mr. Nevarez spoke to a vendor about Mr. Banks and called him "black" in Spanish, were not exhausted at the EEOC stage and thus cannot form a basis for Plaintiffs' racial harassment claim in this action. *Russell v. DeJoy*, No. 23-2968, 2024 WL 3062238, at *1 (8th Cir. June 20, 2024) (citation omitted). The allegations are also fabricated; Mr. Nevarez did not speak Spanish at work and English was his first language. (Calderon Dep. 33-34.) And not only is the alleged comment to a vendor by Mr. Nevarez that Mr. Banks trying to get him fired hearsay, but Mr. Banks could not even remember who told him about the alleged conversation. (Banks Dep. 54). Finally, Mr. Banks admitted in his deposition with respect to Mr. Nevarez calling him "black" in Spanish: "I can't say he was talking about me." (*Id*. at 55-56.)

Plaintiffs assert that Mr. Nevarez's conduct was "preventable" in that the Company should have known about his prior use of the "N" word. (DN 55 at pp. 42, 47.) This is purely speculative. The Company had no such knowledge. (Cornelsen Dep. 50:10-17.) Plaintiffs claim that "Mr. Nevarez called Mr. Smallwood names in Spanish" and that "[a] coworker, Mr. Calderon, told Mr. Smallwood that Mr. Nevarez was calling Mr. Smallwood the 'N' word." (DN 55 at p. 47.) This is inadmissible hearsay which cannot be considered, and disingenuous, as Mr. Calderon testified that Mr. Nevarez did not speak Spanish. *Sherman v. McDonough*, No. 4:21-CV-0924-DGK, 2024 WL 1748023, at *8 (W.D. Mo. Apr. 23, 2024);(Calderon Dep. 33-34.) Plaintiffs' claim is also nonsensical. Even if the Company knew of Mr. Smallwood's concerns, which it disputes, Plaintiffs

argue that Mr. Nevarez should have been terminated (the only way his later alleged conduct could have been completely avoided), because Mr. Smallwood said that Mr. Calderon told him Mr. Nevarez used the "N" word in Spanish behind his back. Plaintiffs are "not self-appointed personnel managers," and they have no say in the Company's decisions. *Day v. Johnson*, 119 F.3d 650, 657 (8th Cir. 1997). Plaintiffs' claims are unsupported by their misplaced allegations that the Company failed to discipline Nevarez for hearsay about alleged behind-the-back name calling.

### C. There is no evidence of pretext with respect to the Company's legitimate actions.

The Company's reasons for issuing the Warning to Mr. Banks in November 2019 are not in dispute. The decisionmaker, Ms. Warren definitively stated that "[i]t was just a verbal warning coaching him on making sure he understands that if an altercation of that kind were to happen again, the best course of action would [] be to [not] interact at all and to simply walk away and go to site management to report the incident." (Warren Dep. 27.) Mr. Banks admitted when the Warning was delivered to him, "she tried to tell me to walk away." (Banks Dep. 57.) The Warning also clearly states "[i]f an incident happens again, you should walk away and alert a supervisor." (Defendant's Exhibit 6, DN 52-6.) Plaintiffs' misleading focus on the mention of "profanity" in the Warning does not undermine the legitimate reasons for counseling Mr. Banks. Plaintiffs' disagreement with the Warning and/or Mr. Banks' reaction does not create an issue of fact. *See Eckelkamp v. Beste*, 201 F. Supp. 2d 1012, 1033 (E.D. Mo. 2002); *Carter v. Pulaski Cnty. Special Sch. Dist.*, 956 F.3d 1055, 1059 (8th Cir. 2020). Rather, the "relevant inquiry is whether [the employer] *believed* [he was] guilty of [the] conduct justifying" the employment action. *Scroggins v. Univ. of Minnesota,* 221 F.3d 1042, 1045 (8th Cir. 2000).

Plaintiffs assert that Mr. Banks did walk away from Mr. Nevarez, but concede that Mr. Banks walked into the locker room and did *not* immediately go to a supervisor, which is what the Company expected him to do. (DN 55 at pp. 51-52; Defendant's Exhibit 6, DN 52-6.) The witness

interview notes plainly show Mr. Banks' threatening behavior, in that he "was being aggressive as well" and stated to Mr. Nevarez, "I can bring 30 guys to back me up." (Defendant's Exhibit 3, DN 52-3.) Mr. Stahl told Ms. Warren that Mr. Banks and Mr. Nevarez "were both up in each other's face nose to nose" and that Mr. Banks stated "I ain't afraid of you." (*Id.*; Stahl Dep. 14.) Mr. Banks was "backtalking" Mr. Nevarez, "going toe to toe." (Stahl Dep. 14.) The Company has the right to counsel its employees on their handling of altercations at work. "[T]he anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." *Kiel v. Select Artificials, Inc*., 169 F.3d 1131, 1136 (8th Cir. 1999). Accordingly, Plaintiffs cannot show that the Warning was issued to Mr. Banks for unlawful reasons.

Finally, Plaintiffs' claim that causation and pretext are clear because "Mr. Banks was the only employee Sun Chemical ever disciplined for profanity" (DN 55 at p. 49, 53.), is without merit because the Final Warning Mr. Nevarez received addressed Mr. Nevarez "using a lot of profanity toward" Mr. Banks. (Defendant's Exhibit 5, DN 52-5.) Plaintiffs' allegation that Banks is the only employee to have ever been counseled about his use of profanity is misleading and inaccurate.[6]

## II. Conclusion.

Plaintiffs' mischaracterization of the October Incident, as well as of the Company's actions and decision-making process, do not create material issues of fact. It is undisputed that Mr. Banks' employment has been unaffected by the alleged conduct and that he is employed with Sun Chemical to this day, making no other complaints. For these reasons, and for the reasons in Defendant's Suggestions in Support of its Motion for Summary Judgment, Defendant respectfully requests the Court grant its Motion to dismiss Plaintiffs' claims in their entirety with prejudice.

---

[6] Although the 2017 incident with Mr. Smallwood and Mr. Nevarez is unrelated to this case, both were counseled on use of profanity during it. (Plaintiffs' Exhibit 7, DN 55-7; Cornelsen Dep. 108-109.) Ms. Cornelsen gave them "word for word" acknowledgments and counseled them on Mr. Smallwood's writing a "a foul name" on Mr. Nevarez's calendar and their subsequent disruptive "yelling match." (Plaintiffs' Exhibit 7, DN 55-7; Cornelsen Dep. 108-109.)

Respectfully submitted,

*/s/  Michael L. Blumenthal*

Michael L. Blumenthal, MO Bar #49153
SEYFERTH BLUMENTHAL & HARRIS LLC
4801 Main Street, Suite 310
Kansas City, MO  64112
Telephone:     (816) 756-0700
Facsimile:      (816) 756-3700
Email:          mike@sbhlaw.com

Mekesha Montgomery
(*admitted pro hac vice*)
Irina V. Strelkova
(*admitted pro hac vice*)
FROST BROWN TODD LLP
150 3rd Avenue South, Suite 1900
Nashville, Tennessee 37201
Telephone:     (615) 251-5550
Facsimile:      (615) 251-5551
Email: mmontgomery@fbtlaw.com
istrelkova@fbtlaw.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2024, a true and accurate copy of the foregoing Defendant Sun Chemical Corporation's Suggestions in Support of Its Motion for Summary Judgment was electronically filed with the Court.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/  Michael L. Blumenthal*

ATTORNEYS FOR DEFENDANT

0084354.0778084   4863-9495-3177v7